**STATE of Indiana, Appellant–Plaintiff,**

**v.**

**Marc FOREMAN, a/k/a Marc Forman, Appellee–Defendant.**

**No. 89A01–9311–CR–366.**

Court of Appeals of Indiana, First District.

April 12, 1995.

Rehearing Denied June 15, 1995.

Pamela Carter, Atty. Gen., Geoff Davis, Deputy Atty. Gen., Indianapolis, for appellant.

Thomas D. Margolis, Muncie, for appellee.

NAJAM, Judge.

## STATEMENT OF THE CASE

The State of Indiana appeals from the trial court's order granting Marc Foreman's motion to suppress evidence obtained as a result of the State's warrantless search of an illegal gambling operation. The State contends there was no Fourth Amendment violation because its search was conducted with the consent of a third party whom the police, at the time of their entry, reasonably believed to possess common authority over the premises.

We reverse and remand.[1]

## ISSUE

We restate the question presented for review as one dispositive issue: whether the State's warrantless search violated the Fourth Amendment or the police held a reasonable belief they had obtained valid consent to search the premises, which obviated the warrant requirement.

## FACTS

On April 3, 1992, Mark Smith, an investigator with the Special Investigations Unit of the Richmond Police Department, went to the Richmond Plaza Bingo Center to ascertain whether it was operating under a proper gambling permit. Smith had received reports that unauthorized bingo games were being conducted at the Bingo Center and, when he arrived, a bingo game involving

---

1. This appeal is taken pursuant to Indiana Code § 35–38–4–2(5).

several hundred people was in progress. Smith immediately went to the rear of the center and spoke with a number of people in the office, including Luther Ogletree, the center's manager. When Smith learned there was no permit to conduct bingo games on the premises, he ordered the game stopped.

After Ogletree told Smith that he was the operator of the bingo game and that he leased the building, Ogletree gave Smith written consent to search the premises. The consent specifically authorized police to search the "Richmond Plaza Bingo" center, as described by its street address. Record at 513. During their search of the Bingo Center, the police found a locked door to a room located at the rear of the building. Smith testified that, upon his arrival, the door had been closed by Guy Vanderpool, a worker at the center whom Smith recognized.

Without questioning Ogletree about the locked door, police officers subsequently removed the door from its hinges and entered the room. Inside, the officers found ten video gambling machines and ten stools. The room, which measured approximately 14' × 6', contained just enough space for the ten machines positioned side-by-side and for ten people to sit in front of them. The room did not contain any bingo supplies.

After police had entered the room and discovered the video machines, Ogletree informed Smith that he did not own the machines. Rather, Ogletree explained, the machines belonged to Marc Foreman. Ogletree then produced a copy of a sublease agreement with Foreman, which provided that Foreman was to pay him $500.00 per month for use of the 14' × 6' room.[2] Foreman had placed the video machines in the room with Ogletree's knowledge, and with the assistance of Vanderpool and Perry Munson, another worker at the center. Before police left, Vanderpool gave Smith a set of keys to the room, which he possessed with Fore-

man's knowledge. One of the keys opened the door to the leased room and another opened the ten video machines.

Police later learned that Vanderpool and Munson tended the video gambling machines for Foreman. Vanderpool and Munson's duties were to reset the machines when players finished and to make "payoffs" to players for credits they accumulated while playing the machines. In addition, the two workers frequently played the machines, as did Ogletree. Foreman testified that he placed the machines in the room for profit and that he made periodic visits to the Bingo Center to check the machines.

When asked who else had access to the leased room, Foreman answered his "help" at the Bingo Center, including Vanderpool, whom he had authorized to open the room to the general public and to those who patronized the bingo games. Record at 482–83. Foreman testified that he placed no restrictions on who Vanderpool could admit into the room to play the video machines and, indeed, that the room was to be left open during bingo games so that bingo players could enter.

On April 30, 1993, Foreman was charged with two counts of professional gambling, both Class D felonies, in violation of Indiana Code § 35–45–5–3(3) and (6). Foreman then filed a motion to suppress and a motion to dismiss. After a hearing on Foreman's motions, the trial court entered the following order granting Foreman's motion to suppress:

> The Court, having taken ruling on defendant's motion to suppress under advisement and having considered the evidence, now grants the defendant's motion to suppress. Evidence seized April 3, 1992, and evidence developed from the search and seizure of evidence from the room containing gaming equipment at the Richmond Plaza Bingo shall not be admitted at trial.

2. The written lease agreement provided in part that:

MAINTENANCE will be handled by management. Right to enter the space during reasonable business hours for the purpose of making repairs, or make routine inspection pursuant

to making repairs, is reserved by management [Ogletree].

Record at 80, 443. The lease agreement bears only the signature of Marc Foreman, as the "Tenant." Record at 80, 443.

*MEMORANDUM*

Police searched the Richmond Plaza Bingo business on April 3, 1992 *with the consent of Luther Ogletree* who apparently operated that business.

During the course of the search, the police entered into a locked room by taking the door off the hinges. Inside they found what are purported to be illegal gaming machines. *The uncontroverted evidence from the State and the defense is that the locked room was in possession of the defendant pursuant to a lease. Ogletree's consent to search was invalid as to the property leased by Foreman.*

*The argument that the police believed they had valid consent to search the premises would be more persuasive had they asked the presumed consenting party to unlock the door rather that taking the door off its hinges to gain entry.*

The court is not persuaded by the State's 'expectation of privacy' analysis. This is an uncertain and developing area of the law. However, the Court will not conclude that one suspected of illegal activity which involves dealing with a segment of the general population has no expectation of privacy. If such were the case, persons suspected to be engaged in a wide variety of illegal activity such as prostitution, drug dealing, fencing, gambling would not be afforded the protections of the Fourth Amendment. Locked doors could be removed or broken down and searches concluded without the necessity of a judicial determination of probable cause.

The requirement of search warrant is intended to protect all from unreasonable searches. The present case highlights the importance of obtaining a warrant when possible. In the present case, first hand information concerning the activities in the subject room was obtainable with a minimal police investigation. The police already suspected illegal gaming in the room, having received several tips. There were numerous customers and workers at the Bingo Plaza that had access to the room and were familiar with the activities therein. An undercover agent could have obtained access with little apparent diffi-

culty. The prudent steps of obtaining a warrant would have prevented the illegal search problem.

Record at 418–19 (emphases added).

Thereafter, the State filed a motion to dismiss in which it asserted that the trial court's order granting Foreman's motion to suppress precluded further prosecution. On August 23, 1993, the trial court granted the State's motion to dismiss and the State appealed. *See* IND.CODE § 35–38–4–4.

## DISCUSSION AND DECISION

### Standard of Review

 The State contends the trial court erred when it granted Foreman's motion to suppress. Because the State bore the burden of proof to show that the warrantless search fell within an exception to the warrant requirement, it is appealing from a negative judgment and on appeal must show that the trial court's ruling was contrary to law. *See State v. Jorgensen* (1988), Ind.App., 526 N.E.2d 1004, 1006; *State v. Blake* (1984), Ind.App., 468 N.E.2d 548, 550. We will reverse a negative judgment only when the evidence is without conflict and all reasonable inferences lead to a conclusion opposite that of the trial court. *Id.* We consider only the evidence most favorable to the judgment and do not reweigh the evidence or judge the credibility of the witnesses. *State v. McLaughlin* (1984), Ind.App., 471 N.E.2d 1125, 1136, *trans. denied.*

### Consent to Search

 Generally, under the Fourth Amendment, "a search warrant is a prerequisite to a constitutionally proper search and seizure." *Stallings v. State* (1987), Ind., 508 N.E.2d 550, 552. However, a valid consent to search obviates the necessity of a warrant. *Id.* Consent to search which is given by a third party having common authority with the defendant over the premises is sufficient to justify a warrantless search. *Id.; see United States v. Matlock* (1974), 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (third party must have common control over the premises to give valid consent to a warrantless search).

■ We need not decide whether, under *Stallings* and *Matlock,* the search in the present case would have been valid if Ogletree had common authority with Foreman over the leased room. Even where a third party in fact lacks common authority to give consent, "a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises." *Myers v. State* (1990), Ind.App., 564 N.E.2d 287, 289–90 (quoting *Illinois v. Rodriguez* (1990), 497 U.S. 177, 179, 110 S.Ct. 2793, 2796, 111 L.Ed.2d 148, 155); *see Kennedy v. State* (1991), Ind., 578 N.E.2d 633, 638, *cert. denied,* 503 U.S. 921, 112 S.Ct. 1299, 117 L.Ed.2d 521.

In *Myers,* we expressly followed the United States Supreme Court's analysis regarding third party consent in *Rodriguez. Id.* at 290. The *Rodriguez* Court examined the warrantless entry and search of Rodriguez's apartment based on the consent of his former cohabitating girlfriend. *Id.* In remanding the case for a further factual determination on this issue, the Supreme Court held:

> [a]s with other factual determinations bearing upon search and seizure, determination of consent to enter must be "judged against an objective standard: *would the facts available to the officer at the moment ... 'warrant a man of reasonable caution in the brief'* " that the consenting party had authority over the premises? If not, then a warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

*Rodriguez,* 497 U.S. at 188–89, 110 S.Ct. at 2801, 111 L.Ed.2d at 161 (emphasis added) (citation omitted). In other words, *Rodriguez* provides that if facts available to the investigating officer at the time of the search would justify the belief, in a person of reasonable caution, that the consenting party had authority over the premises, the warrantless search is not unreasonable. *See id.* This is because "[w]hether the basis for such authority exists [to consent to a search] is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably." *Id.* at 186, 110 S.Ct. at 2800, 111 L.Ed.2d at 160; *see Myers,* 564 N.E.2d at 290.

■ We applied the *Rodriguez* analysis in *Myers* to the warrantless search of Myers' automobile after police obtained consent from the vehicle's registered owner, who was also known to be Myers' employer. *Myers,* 564 N.E.2d at 289–90. Although we determined that the third party did not have actual authority to consent to the search, we went on to conclude that based on the facts available to the officer at the time, his belief "that he had obtained valid consent" was "eminently reasonable." *Id.* at 290. Thus, we held there was no Fourth Amendment violation under the objective test announced in *Rodriguez. Id.; see Kennedy,* 578 N.E.2d at 638 (applying *Rodriguez* analysis to hold police had reasonable belief third party enjoyed common authority to consent to search of gym bag).[3]

■ Here, while the trial court correctly determined "that the locked room was in possession of [Foreman] pursuant to a lease," our analysis does not end there. Record at 418. Under the objective standard from *Rodriguez,* we must consider only *"the facts available to the officer at the moment." Rodriguez,* 497 U.S. at 188–89, 110 S.Ct. at 2801, 111 L.Ed.2d at 161 (emphasis added). This is because "in order to satisfy the reasonableness requirement of the Fourth Amendment," we do not require that the many factual determinations made regularly by police officers "always be correct, but that they always be reasonable." *Id.* at 185–86, 110 S.Ct. at 2800, 111 L.Ed.2d at 160. In determining whether an officer acted reason-

---

**3.** We note that while one's expectation of privacy may be less weighty for commercial premises, *see New York v. Burger* (1987), 482 U.S. 691, 700, 107 S.Ct. 2636, 2642, 96 L.Ed.2d 601, 612, the *Rodriguez* analysis applies here nonetheless. *See Myers,* 564 N.E.2d at 290. Although we need not decide today whether Foreman had a reasonable expectation of privacy in the leased room, we agree with the trial court that the lessor's mere possession of a master key or a limited right to enter the premises under a lease agreement cannot overcome the lessee's legitimate privacy interest in the leased premises. *See United States v. Taketa* (9th Cir.1991), 923 F.2d 665, 673.

ably in such circumstances "due weight must be given ... to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry v. Ohio* (1968), 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889; *cf. Arizona v. Evans* (1995), —— U.S. ——, ——, 115 S.Ct. 1185, 1194, 131 L.Ed.2d 34 (in determination whether to apply exclusionary rule, no indication that arresting officer was not acting objectively reasonable when he relied upon an erroneous computer record).

The facts available to police at the time they entered and searched the room leased to Foreman were as follows. First, Ogletree informed Smith that he was the "operator of the bingo game," the "leaseholder on the premises" and, significantly, "the lessor of the *entire* premise[s]." Record at 492–93 (emphasis added). Officer Smith then obtained Ogletree's written consent "to enter into and search ... at Richmond Plaza Bingo ... for the purpose of searching for evidence." Record at 513. When asked to consent to the search, Ogletree gave his unqualified consent and assured police that he had "nothing to hide." Record at 494.

Next, the room leased to Foreman was within the confines of the Bingo Center at the rear of the building. Smith testified that when he first arrived at the center, the door to that room was open. Immediately thereafter, Smith observed Vanderpool walk to the rear of the Bingo Center and close the door. Because the door to the room had been open when Smith arrived, it was reasonable for him to conclude later when he attempted to open the locked door that Ogletree, as Vanderpool's supervisor and the leaseholder of the premises, had authority over the room.

Finally, contrary to Foreman's assertion on appeal, the evidence is without conflict that Ogletree did not inform police that Foreman leased a room at the Bingo Center until *after* police had conducted their search of the premises and entered the locked room. Indeed, even as police proceeded to remove

the locked door from its hinges, Ogletree stood by and did not request that the search stop or attempt to withdraw or qualify his written consent to the search. In sum, there was no evidence known to police at the time of the search which would indicate that Ogletree's authority over the property was anything less than he had represented. To the contrary, as we stated in *Myers*, "[t]he facts available to [Smith] at the time could not but steer him to the conclusion that he had obtained valid consent for the search. The Fourth Amendment required no more." *Id.*[4]

We acknowledge the trial court's concern that absent the protections of the Fourth Amendment, "[l]ocked doors could be removed or broken down and searches concluded without the necessity of a judicial determination of probable cause." Record at 418. We also agree with the court that if a search is contemplated, when possible, it would be more prudent for law enforcement officers to obtain a warrant rather than to rely upon an exception to the warrant requirement and thus invite suppression issues. In the present case, however, Ogletree's valid consent to search obviated the need for a warrant.

Notwithstanding the high standard which the State must overcome on appeal from a negative judgment, we hold, as a matter of law, that the police officers' belief that Ogletree possessed common authority over the room leased to Foreman was reasonable. Therefore, Ogletree's written consent to search the premises was valid. The trial court's order granting Foreman's motion to suppress is reversed, and we remand this cause for further proceedings not inconsistent with this opinion.

Reversed and remanded.

FRIEDLANDER, J., concurs.

BAKER, J., dissents with opinion.

---

4. Rather than focusing on those facts and inferences available to police at the moment of entry, the trial court's consideration of whether "police [reasonably] believed they had valid consent to search" focused only on their subsequent action of removing the locked door from its hinges. Record at 418. However, applying the *Rodriguez* objective standard, the fact that police removed the door without asking Ogletree to unlock it was not inconsistent with the officers' reasonable belief that they had obtained Ogletree's valid consent.

BAKER, Judge, dissenting.

I respectfully dissent. Although I agree with the majority's analysis of the law under *Rodriguez,* I cannot agree with the majority's conclusion that the police held a reasonable belief that they had obtained Ogletree's valid consent to search the locked room containing the gambling equipment.

Inherent in the trial court's findings is that it did not believe that the police held a reasonable belief that they had obtained valid consent to search the locked room. Specifically, the trial court stated:

> The argument that the police believed they had valid consent to search the premises would have been more persuasive had they asked the presumed consenting party to unlock the door rather than take it off of the hinges to gain entry.

I am persuaded by the trial court's reasoning that had the police reasonably believed that they had obtained valid consent to search the room, they would not have removed the door from its hinges when they could have simply asked Ogletree, who was standing nearby, for a key to unlock the door. Because we, as a reviewing court, are prohibited from reweighing the evidence or judging the credibility of the witnesses, I cannot agree, as the majority contends, that the evidence in this case is without conflict and that all reasonable inferences in this case lead to a conclusion opposite to that of the trial court. Therefore, because I believe that the State failed to meet its burden of proving that the warrantless search fell within an exception to the warrant requirement, I would affirm the trial court's order granting Foreman's motion to suppress evidence obtained as a result of the State's warrantless search.