STATE of Indiana, Appellant,

v.

Marc FOREMAN, a/k/a Marc
Forman, Appellee.

No. 89S01–9508–CR–979.

Supreme Court of Indiana.

March 11, 1996.

Pamela Carter, Attorney General, Geoff Davis, Deputy Attorney General, Indianapolis, for Appellant.

Thomas D. Margolis, Muncie, for Appellee.

## ON PETITION TO TRANSFER

SULLIVAN, Justice.

### Facts

Defendant Marc Foreman, a.k.a. Marc Forman, leased a room at the Richmond Plaza Bingo Center in Richmond, Indiana, from Luther Ogletree, the operator and manager of the bingo hall.

On April 3, 1992, after receiving a report that unauthorized bingo games were being conducted at the bingo center, investigator Mark Smith with the Special Unit of the Richmond Police Department went to the bingo center to see if it was operating under a proper gambling permit. Upon his arrival to the bingo center, Smith observed several hundred people playing bingo. Smith also learned that there was no proper permit for the bingo games and subsequently ordered the games to cease.

While Smith was at the bingo center, Ogletree identified himself to Smith as the operator of the bingo center and the leaseholder on and lessor of the premises, and then gave Smith written consent to search the premises. During the search of the premises, Smith and assisting officers encountered a locked door. The officers removed the door from its hinges and entered the room behind

the door. Inside the room the officers found ten video gambling machines with stools in front of them. Ogletree told Smith the machines were not his and that he was renting the room to defendant. The door to the room was generally left open during bingo games to allow access to patrons of the bingo hall.

On April 30, 1993, Foreman was charged with two counts of professional gambling, both Class D felonies.[1] In response, Foreman filed a motion to suppress and a motion to dismiss, claiming that Ogletree's consent to search was invalid as to the room leased by him. The trial court granted Foreman's motion to suppress and in doing so stated:

> The argument that the police believed they had valid consent to search the premises would be more persuasive had they asked the presumed consenting party to unlock the door rather than taking the door off its hinges to gain entry. . . .

> The requirement of a search warrant is intended to protect all from unreasonable searches. The present case highlights the importance of obtaining a warrant when possible. In the present case, first hand information concerning the activities in the subject room was obtainable with a minimal police investigation. The police already suspected illegal gaming in the room, having received several tips. There were numerous customers and workers at the Bingo Plaza that had access to the room and were familiar with the activities therein. An undercover agent could have obtained access with little apparent difficulty. The prudent steps of obtaining a warrant would have prevented the illegal search problem.

Thereafter, the State filed a motion to dismiss, which the trial court later granted. The State then appealed the trial court's granting of Foreman's motion to suppress, claiming that the search was valid. The Court of Appeals agreed and reversed the trial court. *Indiana v. Foreman*, 649 N.E.2d

120, 125 (Ind.Ct.App.1995). Judge Baker dissented and agreed with the trial court that valid consent had not been obtained in this case and that therefore a warrant was necessary. *Id.* Foreman seeks review of the Court of Appeals decision and we granted transfer on August 17, 1995.

### Discussion

Foreman maintains that the trial court was correct in granting his motion to suppress, because the State's warrantless search of the room he leased at the bingo center constituted a violation of his Fourth Amendment rights.[2] The State asserts, and the Court of Appeals agreed, that there was no Fourth Amendment violation since the police conducted the search with the consent of Ogletree, whom the police reasonably believed to have authority over the premises searched.

### I

█ Under the Fourth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, all searches of private property must be reasonable. U.S. Const. amend. IV; *Fair v. State*, 627 N.E.2d 427, 430 (Ind.1993). "A warrantless search is presumed to be unreasonable, and the State bears the burden to show that the search falls under an exception to the warrant requirement." *Smith v. State*, 565 N.E.2d 1059, 1060 (Ind.1991) (citing *Brooks v. State*, 497 N.E.2d 210 (Ind. 1986)). The validity of a warrantless search turns upon the facts of each case. *Savage v. State*, 523 N.E.2d 758, 760 (Ind.1988).

█ As the Court of Appeals correctly pointed out, "a valid consent to search obviates the necessity of a warrant." 649 N.E.2d at 123 (citing *Stallings v. State*, 508 N.E.2d 550, 552 (Ind.1987)). Consent to search may be granted by a third party who has common control over the premises searched. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct.

---

1. Ind.Code § 35–45–5–3(3) and (6).

2. The Fourth Amendment to the U.S. Constitution reads, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall

not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

988, 993, 39 L.Ed.2d 242 (1974). To establish common authority, the State must show that the third party had joint access or control over the premises. *Id.* at 171 n. 7, 94 S.Ct. at 993 n. 7.

■ In this case, the Court of Appeals declined to determine whether or not Ogletree 'had common authority over the leased premises, because even where a third party does not actually have common control over the premises, if the police at the time of the entry reasonably believed that the third party had common control over the premises, the warrantless entry may be valid. *Illinois v. Rodriguez*, 497 U.S. 177, 179, 110 S.Ct. 2793, 2796–2797, 111 L.Ed.2d 148 (1990). The Court of Appeals applied the *Rodriguez* analysis to the facts of this case and conclud- ·ed that the police officers reasonably believed that Ogletree had common authority over the leased premises. In so concluding, the Court of Appeals relied on the facts that Ogletree informed the police that he was the operator of the bingo game and the lease-holder on the premises, that Ogletree gave permission to search the Richmond Plaza Bingo Hall, and that the officers did not find out that Foreman leased the room until after the search was conducted. 649 N.E.2d at 125.

■ We do not find the Court of Appeal's analysis convincing for several reasons. First, in light of the fact that the police officers took the door off of its hinges to gain access to the room instead of merely asking Ogletree to unlock the door, the evidence is at least conflicting that the officers reasonably believed that Ogletree had common authority over the leased premises. Second, and more importantly, we believe that even if the officers had reasonably believed that Ogletree had common authority over the

leased premises, we find no evidence that Ogletree *consented* to the search of the locked room. It is irrelevant whether or not the officers thought Ogletree had common authority over the leased premises if it is not first clear that he actually consented to a search of the leased premises. *Rodriguez*, 497 U.S. at 177, 110 S.Ct. at 2795 (third party clearly consented to search first.) As the trial court said, "The argument that the police believed they had valid *consent* to search the premises would be more persuasive had they asked the presumed consenting party to unlock the door rather than taking the door off its hinges to gain entry." (emphasis add- ed).

■ We agree with the trial court that had the police reasonably believed that Ogletree gave permission to search the room, the police simply would have asked Ogletree to unlock the door. Instead, the police took the door off its hinges to gain access to the room. We acknowledge that Ogletree had signed a written consent permitting a search of the Richmond Plaza Bingo Hall, without any explicit exclusion of the locked room. However, we cannot reconcile that fact with the inconsistent behavior of the police in removing the door off the hinges when Ogletree was standing right there and could have easily provided a key to unlock the door. We conclude there was sufficient evidence that Ogletree did not validly consent to a search of the leased premises to· support the trial court's grant of the motion to suppress.[3]

## II

The State also argues that even if valid consent was not given, the defendant did not have a legitimate expectation of privacy in the area searched and that therefore the

**3.** Because we find that there was no valid con- sent to search the locked room in this case, we also decline to give an extensive analysis to the issue of whether or not Ogletree had actual com- mon authority over the leased premises. Gener- ally, landlords do not have common authority over the leased premises of their tenants. *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir.1995), *cert. denied* —— U.S. ——, 116 S.Ct. 715, 133 L.Ed.2d 669 (1996) (citing *Chapman v. United States*, 365 U.S. 610, 616–618, 81 S.Ct. 776, 780–

781 (1961). However, the test to determine whether common authority exists entails looking at the joint access or control over the premises. *Matlock*, 415 U.S. at 171, 94 S.Ct. at 993. In this case, it is a close call whether or not Ogletree had actual common authority. The evidence showed that Ogletree had a key to the room, had permission to access the room at essentially any time, and often did access the room for various purposes. However, again, the dispositive issue was whether or not Ogletree even *consented* to a search.

search did not violate the defendant's Fourth Amendment rights.

■ "[A] Fourth Amendment violation must establish [ (i) ] that the defendant had an actual or subjective expectation of privacy and [ (ii) ] that the claimed expectation must be one which society recognizes as reasonable." *Blalock v. State*, 483 N.E.2d 439, 441 (Ind.1985) (citing *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979) and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). This two prong test was initially espoused in Justice Harlan's well known concurrence in *Katz* and has come to play a vital role in Fourth Amendment jurisprudence.

### A

The first prong of the test requires a determination that the defendant held an actual, subjective expectation of privacy in the area searched. *Katz*, 389 U.S. at 361, 88 S.Ct. at 516–17. In making this determination, courts have historically looked to the steps that the defendant took to preserve his or her privacy. *See California v. Ciraolo*, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (A ten foot fence placed by the defendant around his yard was evidence that he took precautions to maintain his privacy, at least with respect to street level viewers.); *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (By taking steps to place his personal effects in a locked footlocker, the defendant manifested an expectation of privacy.); *Katz*, 389 U.S. at 351–52, 88 S.Ct. at 511 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of the Fourth Amendment protection.... But what he *seeks to preserve* as private, even in an area accessible to the public, may be constitutionally protected.") (emphasis added); and *United States v. Burnett*, 890 F.2d 1233, 1239 (D.C.Cir.1989) (In determining that defendant did not have a reasonable expectation of privacy, court focused on steps not taken to preserve privacy. "Had Burnett's subjective expectation of privacy been more pronounced, he would, presumably, have *closed the door* to the bedroom in which he was staying....") (emphasis added).

The State argues that the defendant took no precautions to maintain privacy because the room he leased was open to the public. Although it is true that the room was open to the general public during business hours, at the time that the officers encountered it, the room was no longer open to the public. Sometime before encountering the locked door, the police had ordered the games to cease, which thereafter effectively closed the center. One of the employees had then closed and locked the door to the leased room, cutting off access at that point to the general public.

In this case, we acknowledge that had the officers entered the room while the door was open and the rest of the public had access, the defendant likely would not have had an expectation of privacy at that time. *See Maryland v. Macon*, 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985) (There is no reasonable expectation of privacy in an area that is open to the public.) But that is not what happened here—as demonstrated by the fact that the police could only gain access by removing the doors from its hinges while it was closed and locked.

■ Furthermore, it has been held that in order to claim a defendant did not have an expectation of privacy in premises that were open to the public, the officers must have viewed incriminating evidence as regular customers would. "[G]overnment agents cannot attempt to justify a warrantless search on a claim of reduced expectation of privacy on business premises when the agents do not see the items as a customer would ordinarily see them." *United States v. Swart*, 679 F.2d 698, 701 (7th Cir.1982) (citing *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 329, 99 S.Ct. 2319, 2326, 60 L.Ed.2d 920 (1979)). Since the officers had to remove the door from its hinges, it is clear that the officers did not enter the premises as regular customers during business hours would.

■ In addition, we agree with the Court of Appeals that the mere fact that Ogletree and a few other entrusted persons had a key to the premises did not negate defendant's reasonable expectation of priva-

cy.[4] The fact that other employees or entrusted people have a key to one's office does not defeat that person's expectation of privacy in his or her commercial premises. *United States v. Taketa*, 923 F.2d 665, 673 (9th Cir.1991) ("[A]llowing the existence of a master key to overcome the expectation of privacy would defeat the legitimate privacy interest of any hotel, office, or apartment complex.... Privacy does not require solitude.").

■ When the doors were closed and locked and access to the general public cut off, a measure was taken to maintain privacy with respect to that room. In light of this effort, we believe the defendant had a subjective expectation of privacy at least during the times that the door was closed and locked and general public access denied.

### B

This does not end our inquiry, however, as we must further determine whether Foreman's expectation of privacy in this case is one that society would recognize as reasonable. *Katz*, 389 U.S. at 361, 88 S.Ct. at 516–17.

■ Although the expectation of privacy with regard to commercial premises is less than the expectation of privacy with regard to private homes, *New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987),[5] the United States Supreme Court has established that the Fourth Amendment prohibition against unreasonable searches does apply to commercial businesses. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311, 98 S.Ct. 1816, 1819–20, 56 L.Ed.2d 305 (1978) ("The Warrant Clause of the Fourth Amendment protects commercial buildings as well as private homes. To hold otherwise would belie the origin of that amendment, and the importance of the American colonial experience.") As we discussed in *part II–A, supra,*

an expectation of privacy in business premises while general public access is available is not likely to be considered reasonable, at least as long as the officers view items as ordinary customers would. *See Macon*, 472 U.S. 463, 105 S.Ct. 2778, and *Swart*, 679 F.2d 698. However, in a case such as this one, where the general public no longer had access to the room and the door was closed and locked, we believe society would recognize defendant's expectation of privacy as reasonable. Simply because one allows general access to a facility during certain times, does not mean that that person has forgone any expectation of privacy with respect to that facility during times he or she wishes to exclude others. In fact, we are hard pressed to think of a situation where our society would be more likely to recognize that a commercial establishment's expectation of privacy is reasonable than when the doors have been closed and locked and business hours are over. Finally, we believe this conclusion is consistent with the United States Supreme Court's recognition of what it called "our society's historical understanding that owners of such [commercial] property have a legitimate interest in being free from unnecessary government inspections." *Marshall*, 436 U.S. at 311–313, 98 S.Ct. at 1819–1821.

### Conclusion

■ Because the defendant had a reasonable expectation of privacy in the leased room, there was no valid consent to search the premises, and no other valid exception to the warrant requirement was claimed, the warrantless search of the leased premises was unconstitutional and the trial court's motion to suppress was appropriate.

Therefore, we vacate the decision of the Court of Appeals and affirm the trial court's

---

4. Given the Court of Appeals' disposition of this case, it found it unnecessary to decide whether Foreman had a reasonable expectation of privacy in the locked room. The Court of Appeals did observe, however, that it agreed with the trial court that lessor's mere limited right to enter the room and possession of a key do not overcome the defendant's expectation of privacy in the leased room. 649 N.E.2d at 124 n. 3.

5. "An expectation of privacy in commercial premises ... is less than a similar expectation in an individual's home." *Burger*, 482 U.S. at 699, 107 S.Ct. at 2642 (citing *Donovan v. Dewey*, 452 U.S. 594, 598–99, 101 S.Ct. 2534, 2538, 69 L.Ed.2d 262 (1981)).

grant of defendant Foreman's motion to suppress.

SHEPARD, C.J., and DeBRULER, DICKSON and SELBY, JJ., concur.