Colorado Court of Appeals Opinions || September 24, 2015


Colorado Court of Appeals -- September 24, 2015
2015 COA 131. No. 12CA0715. People v. Morehead.



 Â 

 
 
 
 COLORADO COURT OF APPEALS

 
 2015 COA 131

 
 



 Court of Appeals No. 12CA0715
 Weld County District Court No. 10CR1526
 Honorable Timothy G. Kerns, Judge


 The People of the State of Colorado,

 Plaintiff-Appellee,

 v.

 Mikel Morehead,

 Defendant-Appellant.


 ORDER REVERSED, JUDGMENT REVERSED,
 AND CASE REMANDED WITH DIRECTIONS

 Division V
 Opinion by JUDGE TERRY
 RomÃ¡n and Ashby, JJ., concur

 Announced September 24, 2015


 Cynthia H. Coffman, Attorney General, Ethan E. Zweig, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

 Douglas K. Wilson, Colorado State Public Defender, Meghan M. Morris, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

 
 Â 

 Â¶1Â Â Â Â Â Â Â Â  Defendant, Mikel Morehead, appeals the judgment of conviction entered on a jury verdict finding him guilty of possessing methamphetamine, possession of methamphetamine with intent to distribute, and seven gambling charges. Much of the inculpatory evidence at trial resulted from a warrantless search of defendantâs house. The search was consented to by N.H., defendantâs long-time girlfriend, whom he had recently âkicked outâ of the house. Upon review of these facts, which present several novel questions in the law of third-party consent, we conclude that N.H. had neither actual nor apparent authority to consent to the search. Therefore, we reverse and remand for a new trial.

 I. Background

 Â¶2Â Â Â Â Â Â Â Â  Defendant lived with N.H. for eight years in the downstairs residence of a subdivided house that his mother owned, but for which he paid the mortgage. After defendant kicked N.H. out, she began staying with a friend. Three days after she was kicked out, N.H. was in the process of moving some of her possessions out of the house when she got into an altercation with defendant. The altercation resulted in defendantâs arrest on a domestic violence charge, and N.H. then told the police that she wanted to discussÂ defendantâs other criminal activities, which she described as operating gambling machines and dealing methamphetamine. N.H. gave consent for the police to search defendantâs residence. Without a warrant, the police searched a portion of defendantâs residence, and that search revealed the presence of illegal gambling machines and padlocked doors.

 Â¶3Â Â Â Â Â Â Â Â  Immediately after the warrantless search, the police began the process to obtain a warrant to search the residence. A second search was conducted pursuant to a warrant, and that search revealed incriminating evidence that defendant was involved in dealing methamphetamine and illegal gambling. Because the trial court found that N.H. had both actual and apparent authority to consent to the search of the house, it denied defendantâs motion to suppress all of the evidence, and, after a jury trial, defendant was convicted of all charges.

 II. Actual and Apparent Authority

 Â¶4Â Â Â Â Â Â Â Â  Defendant first contends that the trial court erred in determining that N.H. had authority to consent to the warrantless search of his house. We agree.

 A. Standard of Review and Applicable Law

 Â¶5Â Â Â Â Â Â Â Â  In reviewing a trial courtâs ruling on a suppression motion, we defer to the courtâs findings of fact, but analyze de novo the application of legal standards to those facts. People v. Kazmierski, 25 P.3d 1207, 1210 (Colo. 2001).

 Â¶6Â Â Â Â Â Â Â Â  âThe right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .â U.S. Const. amend. IV. Our nation has long recognized that the home â the center of private life â is entitled to special protection. Georgia v. Randolph, 547 U.S. 103, 115 (2006). Accordingly, the Fourth Amendment generally prohibits the warrantless entry into a personâs home. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990).

 Â¶7Â Â Â Â Â Â Â Â  One exception to the warrant requirement is a search conducted pursuant to validly given consent. Id.; Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). Valid consent must be voluntary, but is not limited to consent by the defendant; it may be obtained from a âthird party who possessed common authority over [the premises] or other sufficient relationship to the premises.â United States v. Matlock, 415 U.S. 164, 171 (1974).

 Â¶8Â Â Â Â Â Â Â Â  âCommon authorityâ rests on âmutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.â Id. at 171 n.7. âThe burden of establishing that common authority rests upon the State.â Rodriguez, 497 U.S. at 181.

 Â¶9Â Â Â Â Â Â Â Â  Even if a third party does not have actual authority to consent to a search, the search is still constitutional if the police have a reasonable good-faith belief that the consenting party has common authority over, or other sufficient relationship to, the premises or effects sought to be inspected. Id. at 188-89; People v. McKinstrey, 852 P.2d 467, 472-73 (Colo. 1993). This is often described as the doctrine of âapparent authority.â See People v. Hopkins, 870 P.2d 478, 480-81 (Colo. 1994). Determination of apparent authority âmust âbe judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the beliefâ that the consenting party hadÂ authority over the premises?â Rodriguez, 497 U.S. at 188 (quoting Terry v. Ohio, 392 U.S. 1, 21-22 (1968)).

 Â¶10Â Â Â Â Â Â Â Â  Apparent authority is not established solely on the basis that the third party believes she is authorized to consent, McKinstrey, 852 P.3d at 472, and officers may not necessarily accept a personâs invitation to enter, Rodriguez, 497 U.S. at 188. âUnder Rodriguez, police officers also should make reasonable inquiries when they find themselves in ambiguous circumstances regarding the authority of the third party to consent to the search.â McKinstrey, 852 P.2d at 473; see Rodriguez, 497 U.S. at 188 (âEven when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry.â).

 B. Discussion

 1. Actual Authority

 Â¶11Â Â Â Â Â Â Â Â  In Rodriguez, the Supreme Court held that the defendantâs girlfriend, who had moved out of their previously shared residence a month before the search, âobviouslyâ did not have commonÂ authority to consent to a search. Id. at 181-82. In reaching that conclusion, the Court considered these additional facts relevant:

 She took her and her childrenâs clothing with her, though leaving behind some furniture and household effects. During the period after July 1 she sometimes spent the night at Rodriguezâs apartment, but never invited her friends there, and never went there herself when he was not home. Her name was not on the lease nor did she contribute to the rent. She had a key to the apartment, which she said at trial she had taken without Rodriguezâs knowledge (though she testified at the preliminary hearing that Rodriguez had given her the key).

 Id. at 181.

 Â¶12Â Â Â Â Â Â Â Â  The facts here are substantially similar to those in Rodriguez. Just as Rodriguezâs girlfriend was not married to Rodriguez, N.H. was not married to defendant. N.H., like Rodriguezâs girlfriend, had recently moved out but still had personal property in the residence. Neither N.H. nor Rodriguezâs girlfriend had an ownership or then-current possessory interest in the residence. Rodriguezâs girlfriend was not a party to the lease and did not contribute to the rent. Here, the only evidence regarding ownership showed that defendantâs mother owned the house and defendant paid the mortgage and utility bills. (Though the trial court found thatÂ â[d]efendant and his mother are legal owners of the house,â we find no support for such co-ownership in the record.) Both Rodriguezâs girlfriend and N.H. had keys to the residence, though, in Rodriguez, the girlfriend testified at trial that she had taken the keys without Rodriguezâs knowledge (despite previous testimony to the contrary).

 Â¶13Â Â Â Â Â Â Â Â  We are unpersuaded that the distinctions drawn by the People require a result different from that reached by the Rodriguez Court. The People highlight that N.H. âhad accessâ to the home when defendant was not at home and was able to invite a friend to help her move, while the girlfriend in Rodriguez ânever invited her friends [to the residence], and never went [to the residence] herself when [Rodriguez] was not home.â Id. at 181. But defendant knew that N.H. was âaccess[ing]â the house that day to move her possessions out, he was in and out of the house himself that day, and he knew that N.H.âs friend was there.

 Â¶14Â Â Â Â Â Â Â Â  More to the point, the trial courtâs findings do not show that N.H. had access for âmost purposes.â See Matlock, 415 U.S. at 171 n.7. To the contrary, the record indicates that her access was for the limited purpose of moving her possessions out. The People have made no showing that N.H. had then-current access for any otherÂ common purpose of a co-inhabitant, such as socializing or sleeping, and the record indicates the contrary: N.H. had been staying at a friendâs house since being kicked out. See Petersen v. People, 939 P.2d 824, 828-29 (Colo. 1997) (caretaker of property with limited duties did not have access, use, and control for most purposes). Thus, like the girlfriend in Rodriguez, N.H. did not enjoy âmutual use and joint access or controlâ of the residence âfor most purposes.â Matlock, 415 U.S. at 171 n.7.

 Â¶15Â Â Â Â Â Â Â Â  The Peopleâs other attempts to distinguish Rodriguez are no more persuasive. The People point to a lack of evidence that defendant ever attempted to dispossess N.H. of keys, and contrast this with the testimony in Rodriguez that the girlfriend had taken keys to the residence without Rodriguezâs knowledge. But the Court in Rodriguez indicated that it was not relying on the girlfriendâs testimony about the keys when it expressly recognized that the trial testimony was directly contradicted by the girlfriendâs pretrial testimony. Further, the fact that, here, N.H. had only moved out three days before the search is not dispositive. Cf. Rodriguez, 497 U.S. at 181 (Rodriguezâs girlfriend moved out of his residence one month before the search).

 Â¶16Â Â Â Â Â Â Â Â  We also reject the Peopleâs attempt to downplay the significance of N.H.âs lack of a continuing property interest after moving out. The People rely on this quote from Matlock: âCommon authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements.â 415 U.S. at 171 n.7. As authority for this principle, Matlock cites Chapman v. United States, 365 U.S. 610 (1961), and Stoner v. California, 376 U.S. 483 (1964). Neither the landlord in Chapman nor the hotel clerk in Stoner had common authority to consent to a search, despite having a property interest in the premises. Chapman, 365 U.S. at 611-12, 616-18; Stoner, 376 U.S. at 488.

 Â¶17Â Â Â Â Â Â Â Â  We do not read Matlock, Stoner, or Chapman to mean that property law is irrelevant to a common authority analysis. Instead, we read them to mean that a review of property interests does not necessarily control the analysis. See 4 Wayne R. LaFave, Search and Seizure Â§ 8.3(a), at 192 (5th ed. 2012) (â[Chapmanâs language limiting property analysis] is not to say, of course, that the law of property is totally irrelevant . . . .â). Our review of cases analyzingÂ common authority shows support for our interpretation; courts (including the Chapman Court) consistently consider the existence or lack of a property interest as part of the common authority analysis. See Chapman, 365 U.S. at 616 (considering that landlord may have had right to enter house to view waste, but noting that entering to search went beyond viewing waste); see also Rodriguez, 497 U.S. at 181 (âHer name was not on the lease nor did she contribute to the rent.â); People v. Breidenbach, 875 P.2d 879, 888 (Colo. 1994) (âWhen third persons have broad rights to access and use of oneâs property, one assumes the risk that they may consent to a search of those areas even if they never actually access or use the property.â).

 Â¶18Â Â Â Â Â Â Â Â  Indeed, in cases analyzing the common authority of a person who moved out of the property subject to search, the existence or lack of a continuing property interest appears to be an important factor, if not the determining factor. The People cite no case, and we have found none, in which a court held that a person who had moved out of a residence, and had no continuing property interest, still retained common authority. Cf. Rodriguez, 497 U.S. at 181 (noÂ common authority existed where girlfriend moved out and did not have name on lease or pay rent).

 Â¶19Â Â Â Â Â Â Â Â  On the other hand, numerous cases have held that common authority existed where a person moved out and had a continuing property interest, usually where consent to search was given by a spouse who had moved out of the marital home. See, e.g., United States v. Trzaska, 859 F.2d 1118, 1120 (2d Cir. 1988) (wife had moved out of marital apartment); United States v. Long, 524 F.2d 660, 661 (9th Cir. 1975) (wife had moved out of marital home and was âjoint ownerâ); People v. Payne, 839 P.2d 468, 469 (Colo. App. 1992) (wife had moved out but was âjoint owner[] of the house with equal right[] of possessionâ); cf. United States v. Ryerson, 545 F.3d 483, 487 (7th Cir. 2008) (girlfriend had moved out but âremained connected to the home through her co-ownershipâ of the taxi business that the couple operated out of the house). All of the cases cited by the trial court in support of its determination that N.H. had actual authority fit into this category.

 Â¶20Â Â Â Â Â Â Â Â  In addition to being supported by case law, our interpretation is consistent with the definition of common authority from Matlock. Under Matlock, common authority comes from some combination ofÂ three components: use, access, and control. See Matlock, 415 U.S. at 171 n.7. When a person moves out of a residence, that personâs use and access are diminished. In such circumstances, where use and access are diminished, it makes sense that courts look to Matlockâs third component of common authority: control. Because we interpret control to mean legal control, we consider a continuing property interest to be relevant to control. Therefore, where, as here, the consent-giver has been ejected from the residence, the existence or lack of a continuing property interest is particularly relevant.

 Â¶21Â Â Â Â Â Â Â Â  We therefore conclude that Rodriguez guides our decision and that the People failed to prove that N.H. had actual authority to consent to the search of the common areas of defendantâs house.

 2. Apparent Authority

 Â¶22Â Â Â Â Â Â Â Â  In contrast with actual authority, apparent authority is determined by an objective assessment of the circumstances known to the police officers. Thus, we begin our analysis with a recitation of those circumstances. At all times relevant to our analysis of the warrantless search and later search pursuant to a warrant, defendant remained in police custody and away from the residence.

 a. Findings Supported by the Record

 Â¶23Â Â Â Â Â Â Â Â  The following facts were found by the trial court, with record support.

 Â¶24Â Â Â Â Â Â Â Â  After defendant had been arrested for an alleged act of domestic violence against N.H. earlier in the day, N.H. told the police that she wanted to discuss other criminal allegations against defendant. She was referred to Investigator Boyle.

 Â¶25Â Â Â Â Â Â Â Â  In her interview with Boyle, N.H. represented that she had been in a relationship with defendant for twelve years and that she had lived at the house for eight years. N.H. said she had full access to the common areas of the residence and intermittent access to other padlocked areas. She described in detail the contents of those areas and the activities that went on inside, including the selling of methamphetamine and operation of gambling machines. During the interview, other police officers were sent to conduct surveillance on the house, and they observed a person briefly stop by the house, driving a white truck. When N.H. was given a description of the driver, she identified him as âJohn,â and she said that he was a regular methamphetamine customer of defendantâs.Â Before the search, the police confirmed that the driverâs vehicle was registered to a man named âJohn.â

 Â¶26Â Â Â Â Â Â Â Â  After the interview, Boyle went with N.H. to the house. Entry into defendantâs residence involved first entering an exterior door that led to a common landing shared by both residences, and then proceeding through an interior door into defendantâs downstairs residence. N.H. telephoned defendantâs son, C.M., in an attempt to have him open the exterior door. When C.M. appeared, he told the officers that they could not enter without defendantâs consent and that N.H. could not enter without defendant being present. Lieutenant Jones told C.M. that N.H. had a right to be at the residence and C.M. ultimately opened the exterior door, but C.M. told N.H. that she would need keys to get into the interior downstairs door.

 Â¶27Â Â Â Â Â Â Â Â  At some point, N.H. went to her truck, which was parked in front of the house, to get keys. N.H.âs truck was in the driveway, full of her belongings, and at some point her bed was leaning against the truck (though it is unclear whether the bed was still leaning on the truck when the officers arrived). One officer testified that N.H. had to âdig[]â through the truck, and another testified thatÂ N.H. âwas looking through some stuffâ in the truck. N.H. found keys in the truck and was able to unlock the interior door to defendantâs residence. The illegal gambling machines and padlocked doors were inside that interior door.

 b. Application of Law to the Facts

 Â¶28Â Â Â Â Â Â Â Â  Some of the information known to the police, standing alone, would allow the officers to reasonably believe that N.H. had authority to consent to the search. N.H. represented that she lived in the house and that she was in a relationship with defendant. The officers were aware that she had been at the residence earlier in the day, engaged in an altercation with defendant. Her description of the property suggested that she had detailed knowledge of it. She knew defendantâs son C.M., and she had keys to the interior door.

 Â¶29Â Â Â Â Â Â Â Â  However, other circumstances created doubt about whether N.H. had authority to consent to a search. She claimed to have been living with defendant for years, but first went to the police to report drug and gambling activity on the day of the alleged domestic violence incident; this indicated that she might have had a motive to lie about her right of access to the house. Next, rather than openÂ the exterior door with her own key, she phoned C.M. to ask him to open the door. This could have indicated to a dispassionate observer that she did not have a key to the exterior door. See LaFave, Search and Seizure Â§ 8.3(g), at 248 (noting that need to circumvent a lock creates ambiguity requiring further inquiry into authority to consent to search); cf. State v. Foreman, 662 N.E.2d 929, 932 (Ind. 1996) (holding no apparent authority where police took door off hinges instead of asking consent-giver for key); but see United States v. Andrus, 483 F.3d 711, 720-22 (10th Cir. 2007) (holding apparent authority was established where police circumvented computer password instead of asking consent-giver for it). Further, N.H.âs truck was full of her belongings, indicating that she was moving out, and the officers said they watched her search through the truck.

 Â¶30Â Â Â Â Â Â Â Â  Most significantly, C.M. told the officers that neither they nor N.H. could enter without defendant present. Although C.M.âs personal objection carried little legal weight as to the search of the downstairs unit because he was not a co-tenant of that unit, see Randolph, 547 U.S. at 106, his statement that N.H. could not enter without defendant present was an indication that N.H.âs livingÂ arrangements might have changed. See Rodriguez, 497 U.S. at 181; LaFave, Search and Seizure Â§ 8.3(b), at 198 (explaining that changes in living arrangements affect common authority except when dispossessed former tenant has a continuing property interest). C.M.âs objection to N.H.âs entry, combined with the strong appearance that she was moving out and had limited access to at least one critical entrance to the residence, should have alerted the police to inquire further into whether N.H. had authority to enter.

 Â¶31Â Â Â Â Â Â Â Â  Several avenues of inquiry were readily available to the police. See United States v. Waller, 426 F.3d 838, 849 (6th Cir. 2005) (noting that failure to make further inquiry was âespecially pronouncedâ when owner was in next room so that inquiry would not have been burdensome). The police could have asked N.H. why her belongings were in the truck; they knew that they had defendant in custody and could have asked him questions; and they could have asked C.M. for further information. Additionally, the trial court found that defendantâs mother owned the house and lived in the upstairs unit, and Investigator Boyle testified that he knew she lived there. Inquiry into any of these available sources might have confirmed that N.H. had been kicked out of theÂ residence, was not defendantâs wife, and may not have had authority to consent to a search.

 Â¶32Â Â Â Â Â Â Â Â  Under these circumstances, it was, at best, unclear whether N.H. had authority to consent to a search, and the police should have made further inquiry into N.H.âs authority before entering the residence without a warrant. Thus, we conclude that she did not have apparent authority to consent to the search. See Rodriguez, 497 U.S. at 188; McKinstrey, 852 P.2d at 473.

 c. Neither Actual Nor Apparent Authority Existed

 Â¶33Â Â Â Â Â Â Â Â  We have determined that N.H. had neither actual nor apparent authority to consent to a search of defendantâs residence. We therefore conclude that the warrantless search of defendantâs house violated the Fourth Amendment.

 3. Harmlessness

 Â¶34Â Â Â Â Â Â Â Â  The People argue that any error was harmless. We note that their harmlessness argument is of a different nature than what is typically argued in Fourth Amendment cases. Significantly, the People do not argue that admission of the evidence from the searches was harmless. Instead, they argue that any error in the trial courtâs finding that there was no Fourth Amendment violationÂ was harmless, because they assert that the evidence from the searches could have been admitted under exceptions to the exclusionary rule. According to the People, the evidence discovered during the later warrant-based search either (a) was not the fruit of the illegal search or (b) would have been inevitably discovered. Because the People did not raise these arguments in the trial court, they are not preserved for our review, and we will not consider them. See People v. Briggs, 709 P.2d 911, 922-23 (Colo. 1985). Moreover, the People have not demonstrated that the error in admitting the evidence was harmless beyond a reasonable doubt.

 Â¶35Â Â Â Â Â Â Â Â  Constitutional error requires reversal unless the error was harmless beyond a reasonable doubt. People v. Burola, 848 P.2d 958, 964 (Colo. 1993). In determining whether an error meets that standard, we must consider âwhether the guilty verdict actually rendered in this trial was surely unattributable to the error,â and ânot whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered.â People v. Fry, 92 P.3d 970, 980 (Colo. 2004) (internal quotation marks omitted). The prosecution bears the burden of proving that the error wasÂ harmless beyond a reasonable doubt. People v. Trujillo, 49 P.3d 316, 326 (Colo. 2002).

 Â¶36Â Â Â Â Â Â Â Â  In determining that the People failed to preserve the argument they now raise, we recognize that âappellate courts have the discretion to affirm decisions, particularly denial of suppression motions, on any basis for which there is a record sufficient to permit conclusions of law, even though they may be on grounds other than those relied upon by the trial court.â Moody v. People, 159 P.3d 611, 615 (Colo. 2007) (emphasis added); see also People v. Aarness, 150 P.3d 1271, 1277 (Colo. 2006) (âOn appeal, a party may defend the trial courtâs judgment on any ground supported by the record, whether relied upon or even considered by the trial court.â).

 Â¶37Â Â Â Â Â Â Â Â  However, the record contains no evidence to support the Peopleâs new theories of admissibility. There was no evidence that the officersâ decision to seek a warrant was wholly independent of what they saw during the illegal search. The fact that they did not begin the process to obtain a search warrant until after the illegal search suggests that there was no such independent decision. See People v. Syrie, 101 P.3d 219, 223 (Colo. 2004) (The inevitable discovery exception to the exclusionary rule âdoes not inviteÂ speculation about possible series of events under which the evidence may have been discovered, but requires an affirmative showing of a reasonable probability that the evidence would inevitably be discovered through lawful means already initiated when the seizure was made.â (emphasis added)).

 Â¶38Â Â Â Â Â Â Â Â  The People also argue that defendant âconsented to the search and directed police to the contraband.â This refers to defendantâs conduct after the following events occurred: he had been placed in police custody, the police had obtained a warrant, and he knew that the officers were cutting padlocks to obtain entry to locked portions of defendantâs residence. We reject the Peopleâs consent argument because any purported consent was clearly not attenuated from the officersâ prior illegal entry. See People v. Rodriguez, 945 P.2d 1351, 1364 (Colo. 1997) (âEven if a defendantâs consent is voluntary, then the evidence will not be admissible unless the consent represents âan act of free will [sufficient] to purge the primary taintâ of police illegality.â (quoting Wong Sun v. United States, 371 U.S. 471, 486 (1963))).

 Â¶39Â Â Â Â Â Â Â Â  Aarness does not compel a contrary conclusion. There, although the prosecution had not raised the doctrine of exigentÂ circumstances in the trial court, the supreme court addressed the doctrine sua sponte because the doctrine was âso inextricably intertwined with the [reasonable belief] analysis for which [the court] granted certiorari that the issue of exigent circumstances [was] properly beforeâ the supreme court. Aarness, 150 P.3d at 1277. There are no comparable circumstances here that would compel us to consider the Peopleâs unpreserved arguments to justify the warrantless search.

 Â¶40Â Â Â Â Â Â Â Â  The People do not argue that the admission of the evidence obtained from the warrantless search, and from the resulting warrant-based search, was harmless beyond a reasonable doubt. In any event, we conclude that its admission could not meet that standard. Because we cannot say that defendantâs conviction was surely unattributable to the illegal search, we must reverse the trial courtâs suppression order, reverse defendantâs conviction, and remand for further proceedings.

 4. Remand

 Â¶41Â Â Â Â Â Â Â Â  We requested supplemental briefing from the parties, asking whether the prosecution should be able to raise arguments regarding attenuation and the exclusionary-rule exceptions on remand even though it failed to raise those arguments in the original suppression hearing. This question was left open by the supreme court in Briggs, see 709 P.2d at 924 n.17 (âWhether the People are precluded from arguing that some or all of the suppressed evidence is admissible against the defendant under the inevitable discovery doctrine upon remand is an issue which was neither briefed nor raised by the parties. Thus, the question, if it is raised, must first be presented to the trial court.â), and the court has not expressly answered it.

 Â¶42Â Â Â Â Â Â Â Â  We conclude that the prosecution is precluded from arguing on remand that any of the evidence derived from the unconstitutional search should still be admitted under the attenuation doctrine or one of the exceptions to the exclusionary rule. Therefore, the evidence from the warrantless search must be suppressed, along with the fruits of the warrantless search, including any statements from defendantâs three phone calls with police following the warrantless search and all evidence obtained during the later warrant-based search of defendantâs residence.

 Â¶43Â Â Â Â Â Â Â Â  We acknowledge that, in People v. Schoondermark, 759 P.2d 715, 717-20 (Colo. 1988), a case involving similar underlying facts,Â the Colorado Supreme Court ordered the trial court to consider the independent-source exception to the exclusionary rule on remand, even allowing the parties to supplement the record. See also Murray v. United States, 487 U.S. 533, 542-44 (1988) (same). But Schoondermark gives no indication of whether the prosecution raised any of the exceptions to the exclusionary rule during the suppression hearing in that case.

 Â¶44Â Â Â Â Â Â Â Â  People v. Quintero, 657 P.2d 948, 951 (Colo. 1983), indicates that, when the prosecution fails to argue alternative grounds of admissibility at a suppression hearing, it may be deemed to have waived those arguments. Id. (âTo remand the case for a hearing under these circumstances would transform the inevitable discovery rule into a vehicle for upholding police conduct based upon an officerâs hindsight appraisal of what constitutionally proper course of conduct he âcouldâ have followed.â).

 Â¶45Â Â Â Â Â Â Â Â  Indeed, more recent decisions of the Colorado Supreme Court tend to deny the prosecution a ââsecond bite at the appleââ where it âfailed to carry its evidentiary burdenâ at the suppression hearing. People v. Null, 233 P.3d 670, 681 (Colo. 2010) (quoting Burks v. United States, 437 U.S. 1, 17 (1978)). The court in Syrie held thatÂ where the âprosecut[ion] chose not to argue that the search . . . was incident to lawful arrestâ at the suppression hearing, it âsurrender[ed]â that argument and âconceded th[e] issue.â Syrie, 101 P.3d at 223.

 Â¶46Â Â Â Â Â Â Â Â  Moody, 159 P.3d at 615, is particularly instructive. There, the supreme court explained that reviewing courts should not consider trial testimony when evaluating the propriety of pre-trial suppression rulings, because, âwere an appellate court to rely on the trial record in its review, the prosecution would, in effect, be accorded a second opportunity to pad the appellate record at trial by injecting evidence that could be used on appeal to affirm what would otherwise be an erroneous suppression ruling.â Id. at 614 (emphasis added).

 Â¶47Â Â Â Â Â Â Â Â  This same rationale cautions against allowing the prosecution to present a previously unargued theory of admissibility on remand in this case. The prosecution bore the burden at the suppression hearing to demonstrate that evidence derived from the warrantless search was admissible. See Outlaw v. People, 17 P.3d 150, 155 (Colo. 2001) (âThe burden of proof always remains with the prosecution âto establish that warrantless conduct on the part of theÂ officers falls within one of the narrowly defined exceptions to the warrant requirement.ââ (quoting People v. Jansen, 713 P.2d 907, 911 (Colo. 1986))); Schoondermark, 759 P.2d at 719 (â[T]he People must bear the burden of establishing by a preponderance of the evidence that the officers would have sought the warrant even absent the information gained by the initial illegal entry.â). Yet the prosecution presented no proof at the suppression hearing that would support admitting the evidence obtained during the warrant-based search under the attenuation doctrine or an exception to the exclusionary rule. Had the trial court here correctly determined that the initial search was unconstitutional, it would have been compelled to suppress the evidence on the record before it. Because that is so, we will not remand to give the prosecution the opportunity to âpad the . . . recordâ on remand with evidence that was not presented at the original suppression hearing. See Moody, 159 P.3d at 614.

 Â¶48Â Â Â Â Â Â Â Â  Moreover, the original suppression hearing was held four years ago, and âgiven the passage of time, there is no reasonable possibility that the trial court could develop a better record upon which to proceed.â Id. at 617.

 Â¶49The Peopleâs reliance on cases that remanded for an analysis under the good-faith exception is misplaced. Cf. People v. Eirish, 165 P.3d 848 (Colo. App. 2007). The statutory good-faith exception creates a presumption that officers act in good faith when they search in reliance on a warrant. See Â§ 16-3-308, C.R.S. 2014. But the People do not argue that the statutory good-faith exception applies here, nor would such an argument be successful, because the initial illegal search here was a warrantless search. Rather, the burden of proof was on the prosecution to demonstrate that the officersâ decision to seek the warrant was independent of the illegal search. See Schoondermark, 759 P.2d at 719.

 Â¶50Â Â Â Â Â Â Â Â  Guided by Moody and Syrie, we conclude that, on remand, the trial court may not consider new arguments for admission of the evidence. The evidence is suppressed.

 III. Remaining Arguments

 Â¶51Â Â Â Â Â Â Â Â  Defendantâs remaining contentions include one alternative suppression argument and two contentions of trial error. Because our decision renders the alternative suppression argument moot, and because we cannot predict whether the remaining issues wouldÂ recur in any retrial, we do not address these remaining contentions. See People v. Becker, 2014 COA 36, Â¶29.

 IV. Conclusion

 Â¶52Â Â Â Â Â Â Â Â  The suppression order is reversed, the judgment of conviction is reversed, and the case is remanded for a new trial.

 JUDGE ROMÃN and JUDGE ASHBY concur.




These opinions are not final. They may be modified, changed or withdrawn in accordance with Rules 40 and 49 of the Colorado Appellate Rules. Changes to or modifications of these opinions resulting from any action taken by the Court of Appeals or the Supreme Court are not incorporated here. 



Colorado Court of Appeals Opinions || September 24, 2015


Back