

IN THE

# Court of Appeals of Indiana

Kathryn M. Jasionowski, et al.,
*Appellant-Plaintiffs/Counterclaim-Defendants*

v.

Town of Whitestown, et al.,
*Appellee-Defendants/Counterclaim-Plaintiffs*



FILED

Aug 21 2025, 8:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

August 21, 2025

Court of Appeals Case No.
24A-CT-2913

Appeal from the Boone Superior Court

The Honorable Matthew C. Kincaid, Judge

Trial Court Cause No.
06D01-2211-CT-1395

---

**Opinion by Judge DeBoer**
Chief Judge Altice and Judge Pyle concur.

**DeBoer, Judge.**

# Case Summary

[1] After a Whitestown ("the Town") official walked into the entryway of a large garage on Michael and Kathryn Jasionowski's residential property, out of which they operated a heating, ventilation, and air conditioning ("HVAC") business, the Jasionowskis filed suit against the Town and the official, asserting claims of an unlawful search and trespass. The Town counterclaimed, alleging the Jasionowskis were in continuous violation of its zoning ordinance. The trial court eventually granted summary judgment in favor of the Town on all claims in the suit and ordered the Jasionowskis to pay $10,000 in fines and $30,000 in attorney's fees to the Town. The Jasionowskis now raise multiple issues on appeal, which we consolidate, reorder, and restate as:

    (1) Whether the trial court erred in denying the Jasionowskis' motion to strike;

    (2) Whether the trial court erred in granting summary judgment in favor of the Town and the official on the Jasionowskis' claims, and the Town on its counterclaim;

    (3) Whether the Town should have been judicially estopped from recovering fines; and

    (4) Whether the Town was entitled to attorney's fees under Indiana Code section 36-1-6-4.

We affirm in part, reverse in part, and remand to the trial court.

## Facts and Procedural History

The Jasionowskis have resided at 401 East Pierce Street in Whitestown, Indiana ("the Property") since 2014. The Property consists of three separate structures: a single-family home, a large garage, and a shed.

Michael has worked in the HVAC field since 2006, and he formed Boone County Heat and Air Conditioning, LLC ("Boone Heating and Cooling") in 2016. Boone Heating and Cooling is registered with the Indiana Secretary of State, and its principal office has always been listed at the Property. A Google search and the business's website both reflect the Property as the location of Boone Heating and Cooling. Web browser and Apple Maps searches show Boone Heating and Cooling has hours of operation from 9:00 a.m. to 5:00 p.m. Monday through Friday.[1] Its website has various HVAC products featured, including furnaces, air conditioning units, mini-splits, heat pumps, boilers, and water heaters. Since 2020, Boone Heating and Cooling has been a dealer of American Standard HVAC products through Duncan Supply Company, Inc., and the business has incrementally increased its annual sales commitment to Duncan Supply from $75,000 in February 2020 to $190,000 in December 2023. The written agreements memorializing these commitments listed the address of the Property as Boone Heating and Cooling's location.

---

[1] The Jasionowskis took initial steps to utilize Google advertising, including providing the Boone Heating and Cooling's days and hours of operation, but ended up not using Google advertising.

[4]     Since its inception, Boone Heating and Cooling has had employees work out of the large garage located on the Property. Kathryn and Sandra Jasionowski, Michael's wife and mother respectively, work out of the garage and take customer calls, accept deliveries, and perform a variety of other administrative, accounting, and human resource-related functions. The business also employs at least two service technicians who install, maintain, replace, and repair equipment for customers. Typically, they drive their personal vehicles to the Property each morning, meet in the garage to plan the workday, speak with their boss (Michael) about projects, drive vans labeled "Boone Heating & Cooling" to customers' homes, return to the Property at the end of the day, and unload and place extracted equipment from job sites behind the garage so it can be removed from the Property each week.

[5]     The garage has many windows through which passersby could "see if somebody's in there or not." Appellants' Appendix Vol. 5 at 154. Neighbors have observed and complained of large box trucks delivering equipment to the Property. Kathryn has signed for these deliveries, and the contents are stored in the garage.[2]

---

[2] One neighbor testified that he first suspected the Jasionowskis were operating a business out of their garage when he noticed a "campaign-type-sized sign" in their yard for a few months that read "Boone Heating & Cooling[,]" and vehicles with the same logo parked in front of the garage every day. Appellants' App. Vol. 4 at 205. At some point, the sign was removed. He also testified that he had seen customers walk into the garage and come out with "air filters and stuff" a "couple of times . . . around 2019 to 2020." *Id.* at 211. By contrast, Sandra testified that the Jasionowskis "did not have customers come [to the Property]" and that the one time a customer did come by, he "was in his vehicle out in the driveway" and she "went outside and got [his] payment." Appellants' App. Vol. 3 at 110. Any dispute concerning the extent to which customers went to the Property does not affect our conclusions regarding the nature of the garage business.

[6]     In November 2020, David Taylor was an employee of the Town. While a sworn reserve police officer, Taylor also served as the Code Enforcement Officer for the Whitestown Code Enforcement Division (WCED) within the Whitestown Metro Police Department (WMPD). In this capacity, he had investigative responsibilities, issued tickets for municipal ordinance violations, enforced the Town's quality-of-life ordinances, and handled the permitting of golf carts and all-terrain vehicles. Taylor was equipped with a badge, body camera, and WMPD-issued gun in the course of his duties.[3] He simultaneously served as director of the Town's Building Department.

[7]     Taylor knew Michael owned Boone Heating and Cooling and had interacted with him before November 2020. Taylor met with Michael regarding the permits needed for the construction of his garage. Taylor also had been inside the garage to inspect and permit a four-wheeler. Before November 4, 2020, Taylor fielded a complaint about delivery trucks coming and going from the Property. Taylor told the Town manager about the complaint, forwarded pertinent paperwork to the Town's legal team already investigating the Jasionowskis for a potential ordinance violation, and drove by the Property.

[8]     On November 4, 2020, after learning the Town planned to pursue legal action against the Jasionowskis for operating a business on the Property, Taylor

---

[3] At his deposition, Taylor testified that while he was acting as a reserve officer, the WMPD required him to turn on his body camera while "interacting with the public." Appellants' App. Vol. 5 at 54. He did not usually operate the body camera while serving in his off-duty code enforcement role.

> took it upon [himself] to go talk to Mike, basically to present an olive branch to let him know that they were working on doing this, to give him a heads-up to say, look, I can probably hold them off for 90 days. Try to find someplace else for now.

Appellants' App. Vol. 5 at 91. Although he was not directed to do this by a supervisor, he believed he was acting in his role as Code Enforcement Officer. Taylor arrived at the Property during business hours wearing his official polo shirt and carrying a firearm on his hip. He walked past cars parked in the driveway to the front of the garage, and as he approached, he looked through a window and saw someone inside. Then he opened the door and stepped into the entryway of the garage. Taylor later testified he was "not there for any kind of investigation." *Id.* at 115. He took no pictures or notes while inside the garage, but he noticed desks, paperwork, computers, and phones, and observed that "it looked like a business." *Id.* Taylor stood in the entryway for a brief time and asked Sandra and Kathryn whether he could speak with Michael. After being told Michael was not present, Taylor explained why he was there and then left the Property.

[9] On May 19, 2021, the Town sent a Notice of Violation to the Jasionowskis' attorney alleging they were in violation of the Town's Unified Development Ordinance (UDO) and directing them to "cease operating their heating and cooling business at the Property[.]" Appellants' App. Vol. 2 at 65. The Jasionowskis' attorney responded on May 28 stating the Jasionowskis were "actively in the process of changing business locations" and requesting an "extension of time to move the business." *Id.* at 67. For months, the Town and

Jasionowskis had similar discussions about their efforts to relocate Boone Heating and Cooling.

[10] On November 4, 2022, the Jasionowskis sued Taylor, the WMPD, and the WCED. On February 10, 2023, the Jasionowskis amended their suit to name the Town and Taylor in his individual and official capacities (collectively, "the Defendants") and demanded a jury trial. The Jasionowskis alleged federal-law claims pursuant to 42 U.S.C. § 1983 ("Section 1983") for unlawful search under the Fourth and Fourteenth Amendments to the United States Constitution and a state-law claim for civil trespass. On March 8, 2023, the Town filed a counterclaim alleging the Jasionowskis operated a business on the Property in violation of zoning restrictions and seeking to enforce its UDO. The Town later moved for a bench trial on its counterclaim, which the trial court denied.

[11] On May 15, 2024, the Defendants moved for summary judgment on all claims to which the Jasionowskis later responded and filed a motion to strike various exhibits the Defendants designated in support of their motion. Following a hearing, the trial court denied the Jasionowskis' motion to strike and granted the Defendants' motion for summary judgment.[4] In addition to providing the Town injunctive relief from the ongoing ordinance violation, the trial court ordered the Jasionowskis to pay fines totaling $10,000 and awarded the Town $30,000 in attorney's fees. This appeal ensued.

---

[4] After receiving the trial court's summary judgment order, the Jasionowskis applied for and received a variance to operate Boone Heating and Cooling on the Property.

## Discussion and Decision

## 1. Motion to Strike

[12] Because a motion for summary judgment hinges on the designated evidentiary material, we begin by considering the trial court's decision to deny the Jasionowskis' motion to strike certain evidence designated by the Defendants. A trial court has broad discretion in ruling on the admissibility of evidence through the granting or denial of a motion to strike. *Luse Thermal Techs., LLC v. Graycor Indus. Constructors, Inc.*, 221 N.E.3d 701, 710 (Ind. Ct. App. 2023), *trans. denied*. "An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it." *Id.* at 710-11.

[13] The Jasionowskis claim numerous exhibits designated by the Defendants were improperly authenticated and some contained inadmissible hearsay.[5] We note, however, that the Jasionowskis did not move to strike other evidentiary materials designated by the Defendants which establish the same material facts as the contested evidence. For example, the depositions in the record establish many facts about the layout of the Property and the business operations conducted thereon, so we need not consult disputed photographs, emails, or reports to establish similar details. Simply put, the contested evidence is either

---

[5] The Jasionowskis dispute the following exhibits: Exhibit G: Emails between the Town and the Jasionowskis' neighbor; Exhibit I: Photographs of the Property; Exhibit J: Emails between the Jasionowskis or their representatives and the Town; Exhibit N[]: Exhibit Q from Michael Jasionowski's deposition (Paycheck Protection Program loan details); Exhibit Q: Property Report Card; Exhibit R: April 2020 WMPD incident report; Exhibit T: Whitestown UDO, adopted July 2020 ("2020 UDO"); Exhibit W: 1998 Whitestown Zoning Ordinance with Amendments: December 2010 ("2010 UDO").

cumulative to uncontested evidence in the record establishing that the Jasionowskis operated an HVAC business out of the garage on the Property, or unnecessary to our resolution of the issues. Consequently, even if the trial court erred in failing to strike any of the contested evidence, the impact of that evidence was sufficiently minor so as not to affect the Jasionowskis' substantial rights, rendering that error harmless. *See* Ind. Appellate Rule 66(A). For these reasons, we decline to disturb the trial court's denial of the Jasionowskis' motion to strike.

[14] Separately, we find that the trial court properly considered Exhibits T (2020 UDO) and W (2010 UDO) in determining whether the Jasionowskis were in violation of the UDO. Indiana Evidence Rule 201 permitted the trial court to take judicial notice of these municipal ordinances on its own, in their designated form or otherwise. *See* Ind. Evid. Rule 201(a)(2)(B), (b)(4), (c)(1).

## 2. Summary Judgment

[15] We review the grant or denial of summary judgment de novo, employing the same standard used by the trial court. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). Summary judgment is appropriate when the designated evidentiary material shows there are no disputed issues of material fact, and the moving party is entitled to judgment as a matter of law. *Cosme v. Clark*, 232 N.E.3d 1141, 1150 (Ind. 2024); Ind. Trial Rule 56(C). In making this determination, we draw all reasonable inferences in the non-moving party's

favor. *Arrendale v. Am. Imaging & MRI, LLC*, 183 N.E.3d 1064, 1068 (Ind. 2022).

## A. Unlawful Search

[16] The Jasionowskis argue the trial court erred in granting summary judgment to the Defendants on their Section 1983 claim for unlawful search. Specifically, they claim that in evaluating whether an unlawful search occurred, the trial court made the "critical error of equating" having or advertising a business at the Property with "inviting the public into the space." Appellants' Brief at 26. In this case, we disagree.

[17] To prevail on a claim brought under Section 1983, a "plaintiff must show that '(1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under the color of state law.'" *Melton v. Ind. Athletic Trainers Bd.*, 156 N.E.3d 633, 649 (Ind. Ct. App. 2020) (quoting *Myers v. Coats*, 966 N.E.2d 652, 657 (Ind. Ct. App. 2012)), *reh'g denied*, *trans. denied*.

[18] The Jasionowskis allege that Taylor's entry into their garage constituted a violation of the Fourth Amendment to the United States Constitution, which protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. Searches conducted in the absence of a warrant issued upon probable cause "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556

U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).[6] Whether Fourth Amendment protections are triggered by the intrusion of a government actor upon an area in which a person claims an expectation of privacy "embraces a two-part inquiry: (1) whether a person has 'exhibited an actual (subjective) expectation of privacy;' and (2) whether 'the expectation [is] one that society is prepared to recognize as reasonable.'" *Holder v. State*, 847 N.E.2d 930, 936 (Ind. 2006) (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring)). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351. The protection against unreasonable searches applies to commercial businesses, although the expectation of privacy in such premises "is less than the expectation of privacy with regard to private homes." *State v. Foreman*, 662 N.E.2d 929, 934 (Ind. 1996) ("[A]n expectation of privacy in business premises while general public access is available is not likely to be considered reasonable, at least as long as the officers view items as ordinary customers would.").

[19] "Which areas of a given piece of real estate may reasonably be viewed as open to visitors is fact-specific" and will "necessarily include consideration of the features of the property itself[.]" *Trimble v. State*, 842 N.E.2d 798, 802 (Ind. 2006) (quoting *Divello v. State*, 782 N.E.2d 433, 438 (Ind. Ct. App. 2003), *trans.*

---

[6] While Taylor served the Town in multiple capacities and possessed traditional law enforcement authority at times, the warrant requirement also applies to administrative searches of residences and business premises conducted to enforce municipal programs. *See Camara v. Mun. Ct. of San Francisco*, 387 U.S. 523, 532-34 (1967); *see also See v. City of Seattle*, 387 U.S. 541, 545-46 (1967).

*denied*). The Jasionowskis focus on the alleged private nature of Boone Heating and Cooling in contending that Taylor's entry violated the Fourth Amendment. They argue "there is no indication" that they "invite[d] the public" into their garage business. Appellants' Br. at 26.

[20] Although the Jasionowskis operated Boone Heating and Cooling out of the large garage located next to their residence on the Property, they merely allude to the intermingled residential and commercial nature of the Property and warn against a holding that would "invite the public, and therefore law enforcement, into a residential space."[7] Appellants' Br. at 26. However, "[t]he route which any visitor to a residence would use is not private in the Fourth Amendment sense, and thus if police take that route for the purpose of making a general inquiry or for some other legitimate reason, they are free to keep their eyes open[.]" *Trimble*, 842 N.E.2d at 802 (quoting 1 Wayne R. LaFave, *Search and Seizure: A Treatise on The Fourth Amendment* § 2.3(e), at 592–93 (4th ed. 2004)).

[21] Taylor did not enter the Jasionowskis' home—he merely walked on their driveway to reach their unlocked commercial garage. Thus, the circumstances

---

[7] While "the area 'immediately surrounding and associated' with" the home, known as the curtilage, receives the special Fourth Amendment status reserved for the home, "there is no Fourth Amendment protection for activities or items that, even if within the curtilage, are knowingly exposed to the public." *Combs v. State*, 168 N.E.3d 985, 992 (Ind. 2021) (first quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013); and then quoting *Trimble* 842 N.E.2d at 802), *cert. denied*.

Even if the Jasionowskis had made a sincere argument that the garage was curtilage, we would not be inclined to find the same. Whether an area is curtilage involves considering "its proximity to the home, its location in an enclosure surrounding the home, its uses, and steps taken to protect it from public view." *Combs*, 168 N.E.3d at 992 n.5 (citing *United States v. Dunn*, 480 U.S. 294, 301 (1987), *reh'g denied*). Here, the separate garage shared a small amount of roof lining with the home, it was not within an enclosure surrounding the home, its use for conducting business operations was publicly observable, and the Jasionowskis took no apparent steps to shield the garage and its commercial use from public observation.

of the present case are akin to those involving business premises, such as *United States v. Tolar*, 268 F.3d 530 (7th Cir. 2001), *cert. denied*. There, agents entered business premises that had an "open-for-business sign" and an "open gate[.]" *Id.* at 531. The agents spoke to the owner, Tolar, and received his consent to search the cargo of a truck, where cocaine and marijuana were discovered. *Id.* The Seventh Circuit found that businesses "that can be observed by anyone passing on the street lack any comparable privacy interest" to that of private residences. *Id.* at 532. "An open gate invites entry, and a chain-link fence does little to assert a privacy interest . . . in details visible from outside the fence." *Id.* While the agents would have needed cause or a warrant "to enter in order to open containers, take soil samples, or otherwise investigate aspects of the lot that the public could not observe from outside[,]" they did not violate the Fourth Amendment "by entering the lot in order to find the owner[.]" *Id.*

[22] Conversely, in *Foreman*, law enforcement received a report that unauthorized bingo games were being played at a bingo center. 662 N.E.2d at 930. During a time when the general public could not access a room in the bingo center and the door to the room was closed and locked, officers removed the door from its hinges and found unauthorized gambling machines. *Id.* at 930-31, 933. The lessor of the room, Foreman, was charged with professional gambling, and the trial court later granted his motion to suppress the evidence obtained from the search. *Id.* at 931. In upholding the trial court's ruling, the Indiana Supreme Court found that "a commercial establishment's expectation of privacy is

reasonable [] when the doors have been closed and locked and business hours are over." *Id.* at 934.

[23] Though the Jasionowskis attempt to distinguish Taylor's entry onto the Property from the circumstances in *Tolar*, we find this case comparable to *Tolar* and distinguishable from *Foreman*. The Jasionowskis used the internet to advertise that Boone Heating and Cooling was located on the Property and to notify the public or other businesses of its days and hours of operation. They also openly received truckloads of HVAC equipment at the Property and discarded scrap material outside the garage. Employees parked on or near the Property during workdays and came and went from the garage in vans marked "Boone Heating & Cooling" that were frequently left publicly visible outside the garage.

[24] And while the Jasionowskis note there was no entrance specifically designated for the public's use and no signage expressly inviting the public into the garage, they do not claim they took any affirmative steps to shield Boone Heating and Cooling from public access. *See Holder*, 847 N.E.2d at 936 (noting the demonstrable intention to keep an object, activity, or area private is relevant to Fourth Amendment analysis); *see also Foreman*, 662 N.E.2d at 933-34 (emphasizing importance of measures taken to maintain privacy in subjective expectation of privacy analysis). There was no privacy fence surrounding the garage and no signage indicating that customers were not welcome to stop in and conduct legitimate business; the garage contained many large windows

which made the inside visible from a distance; and Taylor entered through an unlocked door during business hours after seeing an employee inside.

[25] The totality of the undisputed facts show the Jasionowskis knowingly exposed their commercial business operation to the public and held out their garage as impliedly open to the public to conduct legitimate business. Thus, we conclude the Jasionowskis did not maintain a subjective or reasonable expectation of privacy in the entryway of the garage during stated business hours.

[26] Nevertheless, even if the entryway of Boone Heating and Cooling received constitutional protection, Taylor's entry into the garage did not constitute a "search" in the traditional information-gathering sense of the word under the Fourth Amendment. *See United States v. Jones*, 565 U.S. 400, 407 (2012) (stating the government's "physical intrusion of a constitutionally protected area *in order to obtain information*" may be a violation of the Fourth Amendment) (emphasis added) (quoting *United States v. Knotts*, 460 U.S. 276, 286 (1983) (Brennan, J., concurring)). Taylor did not enter the garage to discover whether a business was being operated out of the garage—as he already knew that was the case. Instead, his entry was to inform Michael of the impending legal action against him and to potentially provide him with additional time to resolve the situation. When Taylor opened the unlocked door of the garage and stepped into the entryway, he briefly spoke to Sandra and Kathryn and then left.[8] Because the

---

[8] The proponent of an unlawful search claim must show the alleged unlawful search caused him actual, compensable injury. *See Heck v. Humphrey*, 512 U.S. 477, 487 n.7 (1994) ("In order to recover compensatory damages [] the [Section] 1983 plaintiff must prove not only that the search was unlawful, but that it caused

undisputed evidence shows the Jasionowskis had no reasonable expectation of privacy that was infringed upon when Taylor opened the commercial garage's unlocked door during business hours, stood in the entryway, and asked for the businessowner, we find that a Fourth Amendment violation did not occur. [9]

## B. Trespass

[27] Relatedly, the Jasionowskis argue the trial court erred by granting summary judgment in favor of the Defendants on their claim of trespass. A plaintiff successfully establishes a trespass claim by proof of two elements: (1) "that he possessed the land when the alleged trespass occurred[;]" and (2) "that the trespassing defendant entered the land without a legal right to do so." *Samples v. Wilson*, 12 N.E.3d 946, 950 (Ind. Ct. App. 2014). Here, it is undisputed the Jasionowskis owned the Property; therefore, the critical question is whether Taylor's entry was authorized. *See Reed v. Reid*, 980 N.E.2d 277, 294, 295 (Ind. 2012) (noting every unauthorized entry in Indiana constitutes trespass, and damages are not an element of trespass). The trial court found, in part, that Taylor's entry into the garage on the Property was "implied[ly] authorized . . .

him actual, compensable injury[.]"). Due to the harmless nature of Taylor's entry, it is unclear what compensable injury, if any, the Jasionowskis suffered as a result.

[9] For similar reasons, Taylor was entitled to qualified immunity from the Fourth Amendment claim asserted against him. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle*, 566 U.S. at 664). Whether an official is entitled to qualified immunity is a legal question for the court to resolve. *Fort Wayne Cmty. Schs. v. Haney*, 94 N.E.3d 325, 331 (Ind. Ct. App. 2018). Because we conclude that no search in contravention of the Fourth Amendment occurred, Taylor's entry onto the Property fell within the scope of his qualified immunity, entitling him to summary judgment on the Jasionowskis' unlawful search claim.

because the Jasionowskis publicly held out the Property as the business location of Boone Heating and Cooling." Appellants' App. Vol. 2 at 28. Since we agree that the Jasionowskis held out Boone Heating and Cooling as impliedly open to the public, *see supra* Section 2(A), we find that the Jasionowskis tacitly authorized the public to step into their unlocked garage during business hours, thereby authorizing the same minimal intrusion by Taylor.[10] The trial court properly granted summary judgment to the Defendants on the Jasionowskis' trespass claim.

## C. UDO Violation

[28] The Jasionowskis also argue the Town was not entitled to summary judgment on its claim that they were in violation of the Town's ordinance restricting the use of the Property. During all relevant times, the Property was zoned R3 for medium-density single-family and two-family residential use. The trial court found that operating Boone Heating and Cooling out of the garage did not qualify as a permissible "accessory use" or "home occupation" as those terms

---

[10] The trial court also considered Indiana Code sections 36-7-2-3 and 34-13-3-3(a)(13) in finding that Taylor's entry was "implied[ly] authorized as a natural extension of the [Town's] authority to inspect the Property under I.C. 36-7-2-3[.]" Appellants' App. Vol. 2 at 28. Indiana Code section 36-7-2-3 provides that a local governmental "unit may inspect any structure or other improvement at any reasonable time." Indiana Code section 34-13-3-3(a)(13) provides immunity to a governmental entity or an employee acting within the scope of the employee's employment for losses resulting from "[e]ntry upon any property where the entry is expressly or impliedly authorized by law."

On appeal, the Jasionowskis note Taylor's stated reason for going to the Property was not to inspect the garage and contend the trial court's interpretation of these statutes would conflict with Fourth Amendment jurisprudence. Because we can affirm the trial court's summary judgment ruling "based on any theory supported by the record evidence" and choose to do so on the basis that the Jasionowskis impliedly authorized the public to access their garage during business hours, we decline to address whether the trial court's implementation of these statutes was in error. *See Markey v. Estate of Markey*, 38 N.E.3d 1003, 1006-07 (Ind. 2015). This is not to say that the Jasionowskis impliedly authorized any and all intrusions into their garage or that their consent was not revocable by appropriate words or action.

are defined in the 2020 UDO. *See* Appellants' App. Vol. 4 at 24, 27-28, 179, 184. The court identified multiple violations of the 2020 UDO and concluded there is "no permissible use of a[n] R3 zoned property that allows the Jasionowskis to operate Boone Heating and Cooling on the Property." Appellants' App. Vol. 2 at 24.

[29] On appeal, the Jasionowskis make the narrow argument that there is an open question as to which UDO applied to the Property. They assert that Michael started Boone Heating and Cooling in 2016 under the 2010 UDO and the 2020 UDO contains a grandfathering provision for legal nonconforming uses. *See* Appellants' App. Vol. 3 at 217-19.

[30] "The use of land or buildings may be protected from existing zoning restrictions if the use is one which existed and was lawful when the restrictions became effective and which continued to exist since that time." *Hannon v. Metro. Dev. Comm'n of Marion Cnty.*, 685 N.E.2d 1075, 1081 (Ind. Ct. App. 1997) (quoting *Metro. Dev. Comm'n of Marion Cnty. v. Goodman*, 588 N.E.2d 1281, 1285 (Ind. Ct. App. 1992)). "A person who claims a legal non-conforming use has the burden of establishing his claim." *Bd. of Pub. Works of Hammond v. Alcantar*, 47 N.E.3d 1276, 1282 (Ind. Ct. App. 2015); *see Goodman*, 588 N.E.2d at 1285 ("[N]onconforming use is an affirmative defense which must be proven by the party asserting it.").

> In summary judgment proceedings, as at trial, the burden of establishing the existence of material affirmative defenses is on the defendant. In order to meet this burden, a defendant must

show that a genuine issue of material fact exists as to each element of the asserted affirmative defense. We will affirm a grant of summary judgment if the defendant, in opposition to the plaintiff's summary judgment motion, failed to designate any evidence from which the trial court could infer the elements of the asserted affirmative defense.

*SWL, L.L.C. v. NextGear Capital, Inc.*, 131 N.E.3d 746, 752 (Ind. Ct. App. 2019) (quoting *Paint Shuttle, Inc. v. Cont'l Cas. Co.*, 733 N.E.2d 513, 519 (Ind. Ct. App. 2000), *trans. denied*).

[31] Here, in their summary judgment motion, the Town argued the Property was in continuous violation of the 2020 UDO and separately contended that even under the 2010 UDO "the use of the property was not a prior permitted use[] to be 'grandfathered' in under the July 2020 UDO." Appellants' App. Vol. 2 at 100. In response, the Jasionowskis did not designate any evidence showing their compliance under either UDO. Instead, at the summary judgment hearing, they pointed to a chart in the 2010 UDO listing authorized uses by zoning district and claimed it was the Town's burden to prove the listed exception did not apply. If a requested use was not listed, the 2010 UDO provided the use would be permitted if the designated authority determined it was "similar to a permitted use." Appellants' App. Vol. 4 at 222. The Jasionowskis argue the Town was not entitled to summary judgment because it did not produce evidence showing "whether the Jasionowskis sought permission under the 2010 UDO." Appellants' Br. at 24.

[32] Looking to the 2010 UDO chart, Boone Heating and Cooling constituted a "Plumbing, Heating, & Air Conditioning Dealer" which was not authorized to operate in R3-zoned districts. *See* Appellants' App. Vol. 4 at 226. However, even if Boone Heating and Cooling could have qualified as a different use not listed in the 2010 UDO chart, it was not the Town's burden to prove whether the Jasionowskis sought and were denied permission to operate Boone Heating and Cooling out of the garage on the Property. The Jasionowskis failed to designate any evidence in support of the applicability of this exception or its legal nonconforming use defense generally, and the trial court properly granted summary judgment on the Town's ordinance violation counterclaim.

## 3. Fines

[33] The Jasionowskis next argue the Town should be judicially estopped from being awarded the $10,000 fine ordered by the trial court. "Judicial estoppel is a judicially crafted doctrine" that serves to "protect the judiciary's integrity by prohibiting litigants from playing 'fast and loose' with the judicial process." *Red Lobster Rests. LLC v. Fricke*, 234 N.E.3d 159, 169 (Ind. 2024) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001), *reh'g denied*). The doctrine seeks to "prevent[] litigants from prevailing on contradictory positions in the same or subsequent proceedings." *Id.* at 169. Courts focus on three considerations in determining whether judicial estoppel applies:

> First, whether a litigant's argument is "clearly inconsistent" with its earlier argument. Second, whether the litigant successfully persuaded a court to accept its earlier argument, which means accepting the later inconsistent position "would create the

perception that either the first or the second court was misled." Third, whether the litigant's actions would result in an "unfair advantage" or levy an "unfair detriment" on the opposition if the court did not apply estoppel.

*Id.* at 170 (quoting *New Hampshire,* 532 U.S. at 750, 751) (internal citations omitted).

[34] Here, the Town's counterclaim alleging ongoing UDO violations listed actions the trial court was authorized to take under Indiana Code section 36-1-6-4(b) and specifically requested the court enter a judgment against the Jasionowskis. The Town later requested a bench trial on its counterclaim, arguing "[t]wo separate trials [were] necessary" to address the Town's counterclaim, which was essentially equitable, and the Jasionowskis' claims for damages. Appellant's App. Vol. 2 at 81-82. In that motion, the Town stated, "[t]he additional legal relief requested by [the Town] is not separate from the equitable relief sought and the essential nature of [the Town's] Counterclaim is equitable in nature." *Id.* at 81.

[35] The Jasionowskis take issue with representations the Town made at a hearing on its motion for a separate bench trial on its counterclaim. Specifically, the Town's attorney represented that "the monetary fine . . . is way down [the] list" and "not the crux of [the] injunctive relief that [the Town was] seeking." Amended Transcript at 3. The attorney noted the Town was "not concerned about the money" and "the basis of [the Town's] [counter]claim [was] more to enjoin" the Jasionowskis from continuing to violate the UDO. *Id.* at 3, 5.

In the context of its request for a bench trial on its counterclaim, the Town was attempting to show the "essential features" of its counterclaim sounded in equity to draw the entire action into equity. *See Songer v. Civitas Bank*, 771 N.E.2d 61, 67 (Ind. 2002) (explaining where essential features of suit sound in equity, the entire action is drawn into equity), *reh'g denied; see also* Ind. Trial Rule 38(A) (providing equitable causes of action shall be tried by the court and equitable and legal actions may be tried separately). Persuaded by the Jasionowskis' argument emphasizing the large number of fines they faced, the trial court denied the Town's motion. And although the Town could have requested up to $2,500 for every day the Property was in violation of the UDO, after receiving summary judgment in its favor on the counterclaim, it requested $40 per day for 1,198 days of violations for a total of $47,920. Despite the Town's request, the trial court found a total fine of $10,000 was appropriate. The Town's request for fines at an amount less than what it could have sought was not clearly inconsistent with its position throughout the case. Additionally, the trial court was not misled by the Town's argument in support of its request for a separate bench trial. For these reasons, we conclude the trial court did not err by declining to find that the Town was judicially estopped from seeking fines.

## 4. Attorney's Fees

Lastly, the Jasionowskis contend the Town was not entitled to an award of attorney's fees. Such an award is generally reviewed for an abuse of discretion, and will be affirmed unless the trial "court's decision either clearly contravenes

the logic and effect of the facts and circumstances or misinterprets the law." *River Ridge Dev. Auth. v. Outfront Media, LLC*, 146 N.E.3d 906, 912 (Ind. 2020). The Jasionowskis argue the trial court awarded attorney's fees under a statute that does not authorize recovery of attorney's fees. This issue is resolved through statutory interpretation—a question of law, which we review de novo. *See ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016).

[38] When interpreting a statute, we strive to "give its words their plain meaning and consider the structure of the statute as a whole." *Id.* We "avoid interpretations that depend on 'selective reading of individual words' that lead to irrational and disharmonizing results." *West v. Office of Ind. Sec'y of State,* 54 N.E.3d 349, 355 (Ind. 2016) (quoting *Prewitt v. State*, 878 N.E.2d 184, 186 (Ind. 2007)). It is important to consider "what the statute does not say" in addition to "what it does say." *State v. Dugan*, 793 N.E.2d 1034, 1036 (Ind. 2003). "To the extent there is an ambiguity, we determine and give effect to the intent of the legislature as best it can be ascertained." *ESPN,* 62 N.E.3d at 1196. "[W]e do not presume that the Legislature intended language used in a statute to be applied illogically or to bring about an unjust or absurd result." *Anderson v. Gaudin*, 42 N.E.3d 82, 85 (Ind. 2015) (quoting *City of North Vernon v. Jennings Nw. Reg'l Util.*, 829 N.E.2d 1, 5 (Ind. 2005)).

[39] Known as the American Rule, "[t]he general rule in Indiana . . . is that each party pays its own attorney's fees; and a party has no right to recover them from the opposition unless it first shows they are authorized." *River Ridge Dev. Auth.*,

146 N.E.3d at 912. Here, however, the trial court awarded attorney's fees to the Town under Indiana Code section 36-1-6-4. *See* Appellants' App. Vol. 2 at 30-33. To the extent this statute provides for the award of attorney's fees, such a provision is "in derogation of the common law and must be strictly construed." *City of Jeffersonville v. Env't Mgmt. Corp.*, 954 N.E.2d 1000, 1013 (Ind. Ct. App. 2011). Indiana Code section 36-1-6-4 provides, in pertinent part:

> (a) A municipal corporation may bring a civil action as provided in IC 34-28-5-1 if a person:
>
>> (1) violates an ordinance regulating or prohibiting a condition or use of property; or
>>
>> (2) engages in conduct without a license or permit if an ordinance requires a license or permit to engage in the conduct.
>
> (b) A court may take any appropriate action in a proceeding under this section, including any of the following actions:
>
> . . .
>
>> (9) Imposing court costs and fees in accordance with IC 33-37-4-2 and IC 33-37-5.

[40] The trial court determined the word "fees" in subpart (b)(9) must mean "attorney's fees." It stated, "[t]o find that the word 'fees' refers to anything other than attorney['s] fees would make the words meaningless." Appellants' App. Vol. 2 at 31; *see also ESPN*, 62 N.E.3d at 1199 (noting we avoid statutory interpretation that renders part of a statute superfluous or meaningless).

However, subpart (b)(9) specifically directs that a court may award fees "in accordance with" Indiana Code section 33-37-4-2 and Indiana Code chapter 33-37-5. In other words, it is unnecessary for us to divine meaning from the word "fees" because the plain language of the statute constrains a court's award of fees to those in conformity with enumerated provisions of the Indiana Code. Those provisions, in turn, lay out specific types of fees collectable under specific circumstances, none of which contemplate attorney's fees.[11] The Town does not assert any other basis that would make an award of attorney's fees appropriate in this case. Accordingly, because we conclude the Town was not entitled to attorney's fees under Indiana Code section 36-1-6-4, we reverse the trial court's award of attorney's fees. *See Siwinski v. Town of Ogden Dunes*, 949 N.E.2d 825, 832 (Ind. 2011) (reversing an award of attorney's fees to a town that had successfully enforced its zoning ordinance and stating "there is no statute or ordinance which entitles the Town to a reward of its attorney['s] fees").

## Conclusion

[41] For the foregoing reasons, we affirm the trial court's decision to grant summary judgment to the Defendants on the Jasionowskis' claims and the Town on its

---

[11] Indiana Code section 33-37-4-2 lays out various fees which shall be collected by the clerk of the court when an action for violation of a municipal ordinance results in a judgment, including an ordinance violation fee and other fees potentially required by statute, none of which include attorney's fees. Indiana Code chapter 33-7-5 lays out the appropriate collection of various additional fees and similarly lacks a reference to attorney's fees.

counterclaim. However, we reverse the trial court's award of attorney's fees and remand for the trial court to enter judgment in the amount of $10,000.

[42] Affirmed in part, reversed in part, and remanded.

Altice, C.J., and Pyle, J., concur.

ATTORNEYS FOR APPELLANTS

Brooke Smith
Jenna M. Shives
Stoll Keenon Ogden PLLC
Indianapolis, Indiana

ATTORNEY FOR APPELLEES

Liberty L. Roberts
Church Church Hittle & Antrim
Noblesville, Indiana